IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEDRIA MILLER,

    Plaintiff,

    v.

COVENTRY HOLDING GROUP, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:23-CV-2064-TWT-CMS

**OPINION AND ORDER**

    This is an employment retaliation action. It is before the Court on the Plaintiff Dedria Miller's Motion to Alter the Judgment [Doc. 68] and the Defendant Coventry Holding Group, Inc.'s Motion for a New Trial on Damages [Doc. 71]. For the following reasons, the Plaintiff's Motion to Alter the Judgment [Doc. 68] is GRANTED and the Defendant's Motion for a New Trial [Doc. 71] is DENIED.

**I. Background**

    This matter went to trial on November 4, 2024. A jury found in the Plaintiff Dedria Miller's favor on her sole retaliation claim under Title VII of the Civil Rights Act of 1964 and awarded her a total of $305,925 in damages: $110,925 for net loss of wages and benefits ("back pay"); $100,000 for emotional pain and mental anguish ("compensatory"); and $95,000 in punitive damages. [Docs. 57, 58]. In her Motion to Alter the Judgment, Miller seeks front pay for three years in lieu of restatement, arguing that she is presumptively entitled

to it and that Coventry failed to present any evidence showing that her employment would have ended regardless of the retaliation she endured. [Doc. 68 at 4-9]. In its Motion for a New Trial on Damages, Coventry seeks a new damages trial or a remittitur on the jury's back pay award, arguing that the jury failed to offset the maximum amount Miller would have earned from Coventry between her termination and trial with Miller's actual earnings from her current employer. [Doc. 71 at 3-6]. As both of these motions concern the jury's back pay verdict and the facts necessarily found as part of that verdict, the Court will address these motions in tandem.

## II. Legal Standards

Rule 59(a) authorizes a court, following a jury trial, to grant a new trial "to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). Although not an exhaustive list, a motion for a new trial may rest on claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "Generally, motions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

Under Rule 59(e), a party may move to "alter or amend a judgment . . . no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "The decision to alter or amend judgment is committed to the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion." *Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238-39 (11th Cir. 1985). "[T]here are four appropriate grounds upon which to reconsider a judgment: (1) to correct manifest errors of law or fact, (2) to prevent manifest injustice, (3) to account for an intervening change in controlling law, and (4) to allow the moving party to present newly discovered or previously unavailable evidence." *Tenor Cap. Partners, LLC v. GunBroker.com, LLC*, 2022 WL 12464321, at *2 (N.D. Ga. Oct. 21, 2022).

### III. Discussion

#### A. Coventry's Motion for a New Trial on Damages

In its Motion, Coventry asserts that the evidence at trial demonstrated that the most Miller would have earned had she continued working for Coventry from the date of her termination through her trial was $47,999.42 per year, totaling $126,645.20. (Def.'s Mot. for New Trial, at 3-4). However, it argues that the jury failed to offset this figure by what she actually earned during the same time period with her current employer, which totals $70,577.50. (*Id.* at 4-6). As a result, it contends, the maximum total that the jury should have awarded as back pay was $56,067.70. (*Id.* at 6).

3

In response, Miller argues that the jury's back pay verdict is adequately supported by the evidence presented at trial and should therefore not be disturbed. (Pl.'s Resp. in Opp. to Mot. for New Trial, at 3, 10-12). Specifically, she contends that Coventry's calculations are flawed because they do not take into consideration Miller's second job with Coventry, which she began working in September 2021, and which added at least 40 hours per week to her work schedule. (*Id.* at 4-5). Miller contends that Coventry had the opportunity to introduce her timecards at trial but chose not to do so, so the jury had only her testimony from which to determine the number of hours worked. (*Id.* at 5-6). Finally, Miller argues that Coventry's calculation ignores evidence that she would have continued receiving regular pay raises had she not been terminated and that it was Coventry's burden to introduce actual evidence of her earnings with her new employer. (*Id.* at 7-10).

"Rather than a new trial, a remittitur order reducing a jury's award to the outer limit of the proof may be the appropriate remedy where the damage award is not necessarily the product of undue passion or prejudice, but exceeds the amount established by the evidence nonetheless." *Long v. East Coast Waffles, Inc.*, 762 F. App'x 869, 872 (11th Cir. 2019). On a motion for remittitur, the court "must independently determine the maximum possible award that is reasonably supported by the evidence in the record. Any excess must be remitted, or alternatively, a new trial may be granted on damages."

4

*Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1283 (11th Cir. 2000). The court "need only conclude that the jury could have drawn reasonable inferences from the evidence presented to reach the award." *Long*, 762 F. App'x at 872.

Back pay awards are to be limited to "proven economic loss*." Darnell v. City of Jasper, Ala.*, 730 F.2d 653, 656 (11th Cir. 1984). For that reason, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). In calculating back pay, the Eleventh Circuit has endorsed the "quarterly earnings formula" wherein the amount a plaintiff would have earned from the defendant-employer were she not terminated is reduced by the net amount the employee actually earned during a relevant quarter. *Darnell*, 730 F. 2d at 657; *see also Kendrick v. Jefferson Cnty. Bd. of Educ.*, 13 F.3d 1510, 1513 (11th Cir. 1994). Once the plaintiff has presented evidence on the issue of damages, "the burden of producing further evidence on the question of damages in order to establish the amount of interim earnings or lack of diligence properly falls to the defendant." *Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1470-71 (11th Cir. 1985).

Having considered the parties' arguments and the evidence presented at trial, the Court cannot conclude that the jury's back pay award of $110,925 was outside the range reasonably supported by the evidence. *See, e.g.*, *Frederick*, 205 F.3d at 1283. At trial, Miller presented her 2021 W2 reflecting

5

earnings of $44,799.42 from Coventry for that year, including overtime wages from September onward due to the second position she picked up as a caregiver. [Doc. 61-4 (Plaintiff's Ex. 9)]; (Jury Trial Tr., Vol. II, 38:18-39:3, 40:2-9). She testified that she worked 80 hours per week at Coventry from September 2021 until her termination. (Jury Trial Tr., Vol. II, 38:18-39:5). Miller also testified that when she was terminated, her regular hourly wage was $12.50 per hour and that, at her new job, which she began working at the end of May 2022, she started making $15 per hour but was only working 35 hours per week. (Jury Trial Tr., Vol. II, 39:6-39:9, 41:6-41:12, 45:8-45:12). In the parties' proposed pre-trial order, Miller stipulated that her pay with Coventry was $11 per hour in 2021 and $12.50 per hour in 2022, and that in December 2023, her hourly wage at her new job increased to $17.50 per hour. [Doc. 27, Ex. E ¶¶ 5, 15]. Lastly, Coventry's executive director Deborah Osterhaudt testified vaguely that she had had a conversation "much before and totally unrelated to anything to do with Ms. Clark" about her second role as a caregiver, explaining that Coventry planned to reduce overtime hours, which had been offered as a result of the COVID-19 pandemic. (Jury Trial Tr., Vol. II, 83:4-84:22).

As Miller points out, Coventry's calculations ignore the trial testimony and fail to apply the quarterly earnings formula. In particular, Coventry presented little evidence at trial and none in conjunction with its Motion with

6

regard to its burden on Miller's interim earnings in her new position. *Nord*, 758 F.2d at 1470-71. It cannot now complain that the jury did not properly calculate a setoff based on evidence that the jury did not have before it; especially so where, as here, Coventry's exhibit list listed Miller's 2022 earnings records but Coventry did not seek to admit that exhibit at trial. [*See* Doc. 62-1]. With regard to Coventry's contention that "it is undisputed that [Miller's] overtime hours were being phased out" at the time of her termination, the jury was free to weigh the evidence as to back pay and evidently chose not to heavily weigh Osterhaudt's limited testimony on this issue. (*See* Def.'s Mot. for New Trial, at 3-4). But the Court cannot order remittitur solely because Coventry wishes that the jury had interpreted the evidence differently, so long as the jury's overall interpretation of the evidence was reasonable. *Long*, 762 F. App'x at 872. Therefore, the Court will not adopt Coventry's position that Miller's caregiver hours should not have been included in the back pay calculation. Instead, the Court finds that the determination of the "maximum possible award that is reasonably supported by the evidence" includes the possibility that Miller would have continued working both her housekeeper and caregiver role for Coventry up until her termination. *See Frederick*, 205 F.3d at 1283.

The Court finds Miller's proposed calculations to be mostly correct, with some minor adjustments. At the time she was terminated, Miller earned $500

7

per week ($12.50 per hour at 40 hours per week) in her role as a housekeeper with Coventry, plus an additional $750 per week ($18.75 per hour at 40 hours per week) in her role as a caregiver. This resulted in income of at least $1,250 per week, exclusive of additional overtime hours she may have worked. This weekly figure puts her quarterly earnings at $16,250.[1] The Court will accept Miller's contention that she lost 8 days of income in the first quarter of 2022, totaling $2,000, during which there was no income to set off her loss. In the second quarter of 2022, the evidence supports a conclusion that Miller lost $10,500 ($1,250 per week times 8 weeks, plus 2 days) of earnings from Coventry between April 4 (the start of the second quarter) and May 31, 2022, the last possible date that Miller would have started working at her new job.[2] And in that quarter, assuming a May 31st start date, Miller made $525 per week, for a total of $2,415 for 4 weeks plus 2 days of work. Thus, including this

---

[1] Although Miller also concluded that she earned $500 per week for her housekeeping job and $750 per week for her caregiver job, she calculated a weekly rate of $1,275 per week. Then, she totaled her quarterly earnings with that figure to be $26,000. By the Court's math, $1,250 per week times 13 weeks equals $16,250.

[2] Curiously, Miller states that "there were four weeks and four days (9 days) of back wages at $15.00 per hour for 25 hours per week, for a total set off of $945." (Pl.'s Resp. in Opp. to Mot. for New Trial, at 11). While 9 days of Miller's wages at Coventry does come out to $945, the Court is unsure what "four weeks and four days" references," and 9 days into the second quarter of 2022 does not come close to the "end of May" start date that Miller testified she had at her new job. In other words, the Court is unable to square Miller's proposed calculation as to the second quarter of 2022 with any reasonable interpretation of the evidence.

set off, Miller lost a total of $8,085 for the second quarter of 2022. In the third quarter of 2022 through the third quarter of 2023, Miller would have earned $16,250 per quarter with Coventry, which is offset by her $6,825 earnings each quarter with her new job, totaling a loss of $9,425 per quarter. In the fourth quarter of 2023, Miller still would have earned $16,250 per quarter with Coventry but earned $7,210 in her new job because the parties stipulated that in December 2023, she received a pay raise to $17.50 per hour at her new job. This results in a total loss for the fourth quarter of 2023 of $9,040. From the first quarter of 2024 through the third quarter, Miller would have earned $16,250 per quarter at Coventry, offset by $7,962.50 in earnings at her new job with the rate of $17.50 per hour, totaling a loss of $8,287.50 in each of those quarters. Finally, from the start of the fourth quarter of 2024 through November 6, 2024—the date of the verdict and judgment in this matter—Miller would have earned $7,000 from Coventry and $3,430 in her new job, resulting in a total loss of $3,570 for the fourth quarter of 2024.

In sum, these calculations result in a total loss of wages from March 22, 2022 through November 6, 2024 of $94,682.50. However, as Miller notes, these calculations do not include the possibility that she would have continued to receive regular pay raises in 2023 and 2024, which the parties stipulated Miller received in 2021 and 2022.[3] [*See* Doc. 27, Ex. E ¶ 5]. On this record, the Court

---

[3] The Court's back-of-the-envelope math corroborates this. Including

cannot conclude that the jury's back pay award of $110,925 exceeds "the outer limit of proof," especially given that "unrealistic exactitude" in the calculations is not required. *See Long*, 762 F. App'x at 872; *Akouri v. Fla. Dept. of Transp.*, 408 F.3d 1338, 1343 (11th Cir. 2005) ("Unrealistic exactitude is not required as the back-pay calculation may be based on just and reasonable inference[s] of the missing or imprecise figure[s]." (quotation marks, citation, and brackets omitted)); *see also E.E.O.C. v. Martin Marietta Corp.*, 819 F. Supp. 1030, 1039 (M.D. Fla. Mar. 3, 1993) ("[U]ncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer.")). For these reasons, the Court will exercise its discretion against granting remittitur of the jury's back pay award or a new trial as to damages, and Coventry's Motion for a New Trial on Damages [Doc. 71] will be denied. *McDonough Power Equip., Inc.*, 464 U.S. at 556.

### B. Miller's Motion to Alter the Judgment

In her Motion, Miller argues that she is presumptively entitled to front pay as a result of the jury's verdict in her favor and that front pay in lieu of reinstatement is warranted because the circumstances of her termination make reinstatement untenable. (Pl.'s Mot. to Alter J., at 4-6). She requests three years of front pay calculated based on the hourly rate and hours she was

---

$1.50 per hour raises for 2023 and 2024, the total loss figure comes within the range of the $110,925 in back pay awarded by the jury.

working for Coventry at the time of her termination. (*Id.* at 6-8).

Coventry opposes the Motion, mainly arguing that Miller is not entitled to front pay because she has obtained substantially equivalent employment at an hourly rate higher than what Coventry paid her at the time she was terminated. (Def.'s Resp. in Opp. to Mot. to Alter J., at 3-4). Coventry further contends that, if Miller is entitled to front pay, the overtime hours she worked as a caretaker should not be considered because the trial evidence established that those hours resulted from the COVID-19 pandemic and were being phased out. (*Id.* at 4-6).

Miller responds that Coventry's argument regarding her hours is foreclosed by the jury's verdict awarding her back pay based on her working both the housekeeper and caregiver roles and that the Court is obligated to abide by the verdict. (Pl.'s Reply in Supp. of Mot. to Alter J., at 7-9, 12-13). She contends that Coventry bore the burden of proof on this issue at trial and would have been required to prove that Miller would have lost her secondary caregiver role had she continued working at Coventry. (*Id.* at 9-12).

"Front pay" is an equitable remedy intended to compensate the plaintiff for wages lost between the entry of judgment and reinstatement, or for a period of time post-judgment in lieu of reinstatement. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). Front pay is thus intended to make the plaintiff whole in cases where reinstatement is not a viable option. *Id.* at

11

850. A prevailing plaintiff is "presumptive[ly]" entitled to reinstatement, but the Eleventh Circuit has recognized that where "extenuating circumstances" exist, front pay may be the better option. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1338-39 (11th Cir. 1999). These circumstances include situations where "discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy." *Id.* at 1339 (quotation marks and citation omitted). When the court awards front pay in lieu of restatement, it must "carefully articulate its reasons" for doing so. *Id.* (quotation marks and citation omitted).

"Inherent in any award of prospective relief, such as front pay, is "some risk of uncertainty." *Armstrong v. Charlotte Cnty. Bd. of Cnty. Comm'rs.*, 273 F. Supp. 2d 1312, 1315 (M.D. Fla. Apr. 10, 2003) (citing *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1349 (11th Cir. 2000)). Although a plaintiff is obligated to mitigate her damages by seeking substantially equivalent employment, it is the defendant's burden to prove a failure to carry that duty. *Id.* at 1317. Substantially equivalent employment is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status to those available to employees holding the position from which the Title VII claimant has been discriminatorily terminated." *Pearson v. Fulton Cnty., Ga.*, 2011 WL 13183218, at *9 (N.D. Ga. Sept. 23, 2011). Nonetheless, the court is obligated

12

to consider "what is fair and reasonable under the circumstances" and must avoid "confer[ring] a windfall" on the plaintiff. *Armstrong*, 273 F. Supp. 2d at 1317. "In that regard, although the elimination of a plaintiff's former position prior to trial *may* preclude an award of front pay, it is the defendant's burden to prove, by a preponderance of the evidence, that it would not have employed the plaintiff at the time of trial. *Munoz*, 223 F.3d at 1350.

Under the Seventh Amendment, where a case involves overlapping legal and equitable issues, "the court when sitting in equity will be bound by the jury's prior determination of the legal issues." *Williams v. City of Valdosta*, 689 F.2d 964, 976 n.11 (11th Cir. 1982). To that end, "all findings necessarily made by the jury in awarding the verdict to [the plaintiff] are binding on the parties as well as on the trial court." *Id.* at 976.

Miller is presumptively entitled to reinstatement by virtue of the fact that the jury found in her favor as to her Title VII retaliation claim. *Pollard*, 532 U.S. at 846. Nonetheless, the Court agrees with her that extenuating circumstances would make reinstatement untenable for her, especially in light of the fact that Coventry does not argue that reinstatement is a viable option. Given the nature of Miller's experiences with Coventry, including her allegations regarding Ms. Osterhaudt's role in the retaliation she experienced, there is certainly a history of discord between the parties. This is especially so considering that, at least as of the time of trial, Ms. Osterhaudt was still the

13

executive director at Coventry and therefore would have a close working relationship with Miller if she were reinstated. The jury found that Miller suffered emotional harm, as evidenced by its substantial award of $100,000 for emotional pain and mental anguish. *See Armstrong*, 273 F. Supp. 2d at 1315. For these reasons, the Court finds that an award of front pay is appropriate in this case in lieu of reinstatement. *See Farley*, 197 F.3d at 1338-39.

What Coventry does argue is that Miller is not entitled to front pay because she has obtained and sustained substantially equivalent employment. The Court disagrees that Miller's new job qualifies as substantially equivalent employment such that a front pay award should be entirely precluded. As explained previously in upholding the jury's back pay award, Miller's new job did not provide her the same compensation as her job with Coventry due to her being scheduled for only 35 hours per week. This difference in hours and overtime opportunity means that Miller makes significantly less per week at her new job than she did working her two roles with Coventry. In that same vein, Miller was able to work two jobs with Coventry because she could easily coordinate the schedules of both roles, but there is no evidence that she has had a similar second role opportunity with her new job. *See Pearson*, 2011 WL 13183218, at *9; *Armstrong*, 273 F. Supp. 2d at 1315 (noting that it is the defendant's duty to prove that the plaintiff failed to carry her burden of seeking substantially equivalent employment). Although Coventry again argues that

14

the trial evidence was "undisputed" that it was phasing out Miller's second role as a caregiver due to the end of the COVID-19 pandemic, the jury was free to weigh Ms. Osterhaudt's limited testimony on that issue as it saw fit and, based on the jury's back pay verdict, it necessarily found that Miller would have continued working in both roles had she not been terminated. The Court may not disregard that verdict in ruling on the equitable issues. *Williams*, 689 F.2d at 976 (noting that "all findings necessarily made by the jury in awarding the verdict to [the plaintiff] are binding on the parties as well as on the trial court."). It was Coventry's burden to prove at trial that it would not have continued employing Miller in her secondary role as a caregiver as of the time of trial, and the jury apparently found that Coventry did not carry that burden. *See Munoz*, 223 F.3d at 1350-51.

The Eleventh Circuit has not opined on any precise methodology for calculating front pay. The Court thus relies on instructive district court decisions. Factors which courts consider in awarding front pay can include length of prior employment, work life expectancy, salary and benefits at the time of termination, the possibility of regular promotions and salary increases, and the period of time it may take the plaintiff to become re-employed at a substantially equivalent job. *See, e.g.*, *Carl v. Fulton Cnty., Ga.*, 2013 WL 12357465, at *9 (N.D. Ga. Mar. 31, 2013). Miller testified at trial that she had been working for Coventry since June of 2016. (Jury Trial Tr., Vol. II, 7:23-24).

15

To the Court's knowledge, there was no testimony or evidence as to Miller's age or intended retirement age, but she demonstrated an intent to remain working by seeking other employment after her termination from Coventry. *See Munoz*, 223 F.3d at 1349 (noting that the Eleventh Circuit has "signaled its comfort with awarding front pay" even to plaintiffs who are nearing retirement age). At the time that she was terminated from Coventry, she was paid $12.50 per hour. (Jury Trial Tr., Vol. II, 39:8-9). The parties stipulated that Coventry paid Miller $10.00 per hour in 2019 and 2020, and $11.00 per hour in 2021. [Doc. 27, Ex. E ¶ 5].

Coventry has not raised any argument against the three-year period of front pay that Miller requests beyond arguing against an award of front pay entirely. In light of the fact that front pay is an equitable remedy intended to make the plaintiff whole, the Court finds a three-year period reasonable under the circumstances. *See Armstrong*, 273 F. Supp. at 1315 (noting that front pay awards inherently involved "some risk of uncertainty."). The Eleventh Circuit has upheld front pay awards for much longer periods, and Coventry has not argued that Miller is likely to become employed with substantially equivalent employment in less than three years. *Carl*, 2013 WL 12357465, at *11 (collecting cases). Moreover, the significant pay gap between what Miller was making when she was terminated from Coventry and what she currently makes at her new job counsels in favor of finding the requested three-year

16

period to be reasonable.

The Court finds a quarterly earnings formula to be the most reasonable means of calculating front pay. *See id.* From November 6, 2024—the date judgment was entered in this matter—until the end of the fourth quarter of 2024, Miller earned $1,250 per week at Coventry, totaling $9,750. This figure is offset by $525 per week earned at her new job for that same period, totaling $4,095 in earned income. Thus, Miller is entitled to $5,655 in front pay for the fourth quarter of 2024. For 2025, 2026 and the first three quarters of 2027, Miller would have earned $16,250 per quarter with Coventry, offset by $6,825 in earnings at her new job. Miller is therefore entitled to $9,425 in front pay for each of these eleven quarters. And in the fourth quarter of 2027, through November 6, 2027, Miller would have earned $6,250, offset by $2,625 in earnings at her new job. Miller is thus entitled to $3,625 in front pay for this period. Accordingly, Miller's Motion to Alter the Judgment [Doc. 68] will be granted, and the Court will award her $112,955 in front pay.[4]

---

[4] The Court declines to include potential raises Miller may have earned had she not been terminated in this calculation. While the parties' stipulations and the evidence at trial did demonstrate that Miller received raises at both Coventry and her new job, there was little from which the Court could decipher the regularity with which the raises were given or the formula used to determine the amount of the raises. Thus, the Court finds relying on Miller's pay rate at the time of her termination is fair and reasonable under the circumstances and will avoid giving Miller a windfall as to the front pay award. *See Armstrong*, 273 F. Supp. 2d at 1315.

## IV. Conclusion

For the foregoing reasons, Plaintiff Dedria Miller's Motion to Alter the Judgment [Doc. 68] is GRANTED and the Defendant Coventry Holding Group, Inc.'s Motion for a New Trial on Damages [Doc. 71] is DENIED. The Clerk is DIRECTED to enter an amended judgment in this matter awarding the Plaintiff Dedria Miller $112,955 in front pay.

SO ORDERED, this ___3rd___ day of April, 2025.

*Thomas W. Thrash*
THOMAS W. THRASH, JR.
United States District Judge